# In the United States Court of Federal Claims

No. 14-243C
(Originally Filed: June 27, 2014)
(Reissued: July 11, 2014)[*]

* * * * * * * * * * * * * * * * * * * *

SEK SOLUTIONS, LLC,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

Bid protest; Small Business Set-Asides; Statutory Construction; Rule of Two.

* * * * * * * * * * * * * * * * * * * *

*Ronald K. Henry*, Washington, DC, *David Hibey*, and *Robert J. Wagman, Jr.*, Washington, DC, of counsel for plaintiff.

*Matthew P. Roche*, Civil Division, Department of Justice, Washington, DC, with whom are *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Kirk T. Manhardt*, Assistant Director, and *Allison Colsey Eck*, of counsel with the Defense Logistics Agency Troop Support for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

---

[*] This opinion was originally filed under seal. Publication was deferred pending parties' review for redaction of protected material. The court adopted the parties' suggested redactions, which is indicated by brackets. The opinion is now prepared for release.

Plaintiff SEK Solutions, Inc. ("SEK" or "plaintiff") brings this pre-award protest of the Defense Logistics Agency Troop Support's ("DLA") decision to procure commercially available soft shelter systems ("tents") through an unrestricted indefinite-delivery indefinite-quantity ("IDIQ") contracting vehicle designed to gather available tent systems and accessories into one "Emall" where customers such as the Army, the Navy and various civilian disaster relief services can shop for specific items. We have jurisdiction pursuant to 28 U.S.C. § 1491(b) (2012).

Currently before the court are the parties' cross-motions for judgment on the administrative record pursuant to the Rules of the Court of Federal Claims ("RCFC"), Rule 52.1. The motions are fully briefed, and we heard oral argument on June 5, 2014. At the conclusion of oral argument, we announced that we would deny plaintiff's motion for judgment on the administrative record, and grant defendant's cross motion. We set out our reasons below.

BACKGROUND[1]

The current solicitation, SPM1C1-12-R-0031, replaces the soft shelter systems portion of the existing Special Operational Equipment Tailored Logistics Support Program ("TLSP"). The TLSP was designed to provide a wide range of special operations equipment and was thus not limited to tents. Contracts under the TLSP were set aside for small businesses pursuant to the Federal Acquisition Regulation ("FAR") part 19.502-2(b), which provides the following:

> The contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that:
> (1) Offers will be obtained from at least two responsible business concerns offering the products of different small business concerns . . . ; and
> (2) Award will be made at fair market prices.

48 C.F.R. § 19.502-2 (2013) ("Rule of Two"). Because some of the items supplied through the TLSP were not manufactured by small businesses, the

---

[1] The facts are drawn from the Administrative Record ("AR") and are undisputed.

2

Small Business Administration ("SBA") issued a waiver to the non-manufacturer rule.[2]  AR 599.

Before settling on the instant procurement strategy, DLA Troop Support Contracting Officer ("CO"), Maria Sesso-Punzo conducted market research by contacting three commercial soft shelter manufactures that each responded with interest in competing.  Ms. Sesso-Punzo relied on DLA's knowledge of the industry and the market research to conclude that the Rule of Two could not be satisfied because "there is not one small business or group of small businesses that provide the full array of shelter systems required."  AR 609.1.  She decided to pursue the procurement as multiple award, unrestricted IDIQ contracts with delivery orders to be competed among contract holders, at which level the question of small business set asides would have to be considered again.

Ms. Sesso-Punzo issued the initial solicitation on March 6, 2012.  The solicitation describes the agency's intent to award multiple IDIQ contracts to qualified vendors in order to create a universe of available soft shelter product lines.  The contracts issued pursuant to the solicitation would have one base year and three additional option years.  "The cumulative dollar value of all orders placed on all contracts issued as a result of this solicitation during any period (base year or option) will not exceed $200,000,000.00"  AR 284 (underline in original).

After a pre-proposal conference, the CO issued Amendment 0004 on May 30, 2012.  Amendment number 0004, which updated and replaced most of the content of the solicitation, provides the following:

> The intent of this solicitation is to award multiple Indefinite Delivery, Indefinite Quantity contracts for tent and textile commercial soft shelter systems and associated support components that provide environmental protection to Soldiers, Marines, Airmen, and for Civilian Disaster Relief Purposes.

---

[2] The non-manufacturer rule states "[f]or small business set-asides other than for construction or services, any concern proposing to furnish a product that it did not itself manufacture must furnish the product of a small business manufacturer unless the SBA has granted either a waiver or exception to the nonmanufacturer rule . . . ."  FAR 19.502-2(c); *see* 15 U.S.C. § 637(a)(17) (2012); FAR 19.102(f).

3

>Offers may include complete commercial soft shelter systems and their respective support components for General Purpose Tentage, Utility Shelters, Maintenance Shelters, Command Post Shelters, Vehicle Crew Tents, Lightweight Nylon Tents Assembly Tents, Medical Tents or Arctic Region Tents, Hybrid Soft/Hard wall Shelters.  Support equipment may include stakes or pins, tent lines, textile or modular flooring, environmental support components, storage covers, storage/shipping containers and trailer mounted shelter support systems.

AR 289.  The solicitation further defined commercial soft shelter systems as

>consist[ing] of shelter units that are modular in design allowing accessory upgrades or connectable to another shelter to allow for expansion.  The shelter must be a frame, air beam supported or hard wall box with extendible fabric extensions and constructed from a lightweight, water-resistant, mildew resistant and flame resistant fabric.  It is desired, but not required, that the Commercial Shelter System be supported by a mobile trailer system which is capable of providing electricity and maintaining a controlled environment in all climates and terrains except arctic.

*Id*.

While the solicitation specified that the fabric of the shelter had to be lightweight and resistant to water, mildew, and fire, many of the particular qualities such as reflectivity, durability, and the shelter's ability to withstand sunlight, vibration, heavy wind, steady rain, condensation, or extreme temperatures were left to the determination of the vendor ("to be vendor determined" or "TBVD").  The solicitation required, however, that the soft shelter system come with instructions for assembly and disassembly, conform to safety and health hazard standards, and be repairable in the field.

Vendors were asked to submit their "commercial product catalog" and digital photographs "showing all items that meet the criteria of the Statement of Work," their price list including applicable discounts, and "detailed information on product line requirements for their different products and monthly production maximums."  AR 285.  Whole product lines were sought through the solicitation, although the government reserved the right to award a contract for some items within a product line and reject other items that

failed to meet the evaluation criteria. According to the solicitation, the CO would evaluate the proposals for and award contracts "to all firms offering Commercial Soft Shelter Systems that meet all of the terms and conditions of the solicitation, whose product line meets the statement of work and whose prices can be determined fair and reasonable" under FAR subpart 15.4. AR 340, 372.

The solicitation provided that the government intends to catalog and display on the "Department of Defense's Emall Tent Superstore Website" all complying product lines. AR 290. The specifications provided by the vendors in response to the solicitation will be displayed on the Emall, which will "be used by customers to make online comparison of vendor designs." Id. When an Emall customer identifies the type of shelter that it would like to obtain, then the customer's order will be competed.

The solicitation describes the subsequent delivery order competition as follows: the CO will issue a request for quotation for the individual delivery order, which includes evaluation factors, to all contractors, the interested contractors will return a quote to the CO within the specified time frame, and the CO will make a decision based on price. Vendors that hold contracts "will have the opportunity to present a Brand Name or Equal" product during the delivery order competition. AR 377. During this delivery order process, and throughout the life of the Emall, contractors are permitted to update the items they offer. Because of the variable nature of the need for specific types of soft shelters, DLA guaranteed a minimum dollar value for each contract awardee of $25,000 rather than a minimum quantity of any particular item.

The last date to submit a proposal was June 26, 2012. DLA Troop Support received proposals from [     ] companies, fifteen of which were small businesses. AR 422-23. Even though distributors like SEK were permitted to provide offers in response to the solicitation, plaintiff did not submit a proposal. Rather, SEK challenged the solicitation at the Government Accountability Office ("GAO") on June 25, 2012, on the grounds that it should have been set aside for small businesses.

Plaintiff and the agency participated in GAO's outcome prediction alternative dispute resolution program. During this process, GAO informed the parties that it was likely to sustain SEK's protest because there was insufficient information in the record to support the agency's decision not to set the procurement aside for small businesses. On September 24, 2012, DLA

decided to take corrective action and shortly thereafter the protest was dismissed as moot.

CO Lou Anne Graham implemented the corrective action by conducting additional market research into whether the procurement ought to be set aside. *See* AR 433-54 (September 26, 2013 Market Research Memorandum). First, the CO estimated that moving from the TLSP to a multiple award contracting vehicle would save the agency between $[          ] and $[          ] of "pass through costs" per year. AR 434. Then as part of its market research, the agency contacted eleven soft shelter manufacturers, eight of which were small businesses. Each of the manufacturers contacted "expressed a willingness to submit offers." AR 433.

Next, the CO performed a detailed comparison of the most popular product lines currently procured under the TLSP with the products offered by small businesses "[t]o determine if there are two or more Small Businesses currently offering items that are the same or similar to those items offered by the Large Businesses." AR 435. After ten pages of analysis, the CO observed the following:

> Based on the analysis above, there is significant demand on the part of the customer for products only offered by Large Businesses and for which no Small Business has shown the ability to produce. While there were a few instances in which a Small Business offered a tent that could be considered similar to a tent offered by a Large Business, certain features of each tent were distinguishable enough to determine these tents were not the same. This is further evidenced by the lack of "or Equal" offers submitted on behalf of Small Business manufacturers under the TLSP. As a result of this information, there is no evidence of two or more Small Businesses having within their product line the exact items, or acceptable alternatives, to the items manufactured by Large Businesses.

AR 453. Thus, the CO concluded that "the solicitation will continue as an Unrestricted procurement, as both large and small business are crucial to satisfy the requirements and there are not two or more small businesses within this market capable of providing the full array of Shelters and associated components desired by the customers." AR 454. The CO noted that each delivery order will be competed and that the contractors will have the opportunity to respond with "Brand Name or Equal" items. AR 453-54. The

CO also stated in the market research memorandum that "[p]rior to issuing Request for Quotations (RFQs), the Contracting Officer will determine whether the item has been purchased from Small Businesses in the past and, if so, then the RFQ will be set-aside [sic] for Small Business."[3] AR 454. The SBA approved the CO's decision to issue this procurement as unrestricted. AR 455.

On November 18, 2013, Ms. Sesso-Punzo wrote a letter to SEK informing it that the agency had completed its corrective action, that the market research supported her decision not to set aside the procurement, and that DLA Troop Support would continue to accept proposals until December 1, 2013, which was the new closing date. Additionally, the agency issued Amendment number 0007, which officially extended the deadline to December 2, 2013, and provided "Prior to issuing Request for Quotations (RFQs), the Contracting Officer will determine whether the conditions for issuing the RFQ as a Small Business Set-Aside have been met and, if so, will issue the RFQ as a Set-Aside for Small Business in accordance with FAR 16.505(b)(2)(i)(F)." AR 220.

SEK once again chose not to submit an offer and instead filed a second protest at GAO. On February 27, 2014, GAO denied the protest. *SEK Solutions, LLC*, B-406939.2, 2014 WL 1116782 (Comp. Gen. Feb. 27, 2014). SEK filed its complaint in this court on March 31, 2014.

[     ] vendors submitted offers with their soft shelter product lines. The CO has not yet awarded contracts under this solicitation.

---

[3] The CO presumably was contemplating the mechanism in FAR 16.505(b)(2)(i)(F), which provides, "(i) The contracting officer shall give every awardee a fair opportunity to be considered for a delivery-order or task-order exceeding $3,000 unless one of the following statutory exceptions applies: . . . . (F) . . . contracting officers may, at their discretion, set aside orders for any of the small business concerns . . . ."

DISCUSSION

Plaintiff raises two challenges: first, that the agency's chosen procurement vehicle violates the Competition in Contracting Act ("CICA"),[4] and second, that the contracting officer failed to conduct a proper Rule of Two analysis. We review the agency's action through the lens of 5 U.S.C. § 706(2)(A) (2012), which provides that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Under this standard, the agency's decision is entitled to deference and will be overturned only if "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

I.   CICA, the FAR, and this Hybrid Procurement Vehicle

SEK identifies several sources of law that it argues were violated during the course of this procurement. We take each argument in turn.

   A.   A Creatively Structured Procurement within the Bounds of CICA and the FAR

Plaintiff takes issue with the very nature of the procurement vehicle being used by DLA. SEK characterizes the instant procurement as an improper mimic of the General Services Administration ("GSA") Federal Supply Schedule ("FSS") because it attempts to create a catalogue of available soft shelter systems for purchase at a later date. But the similarities between the instant procurement and the GSA FSS end there, according to plaintiff, because GSA has a special simplified procurement process under FAR part 8, *see Cybertech Group, Inc. v. United States*, 48 Fed. Cl. 638, 647-48 (2001), whereas DLA has no such work-around to CICA and the general competition requirements in FAR part 6. Additionally, plaintiff points out that this

---

[4] Pub. L. No. 98-369, 98 Stat. 494 (1984).

procurement does not fit into one of the exceptions from the competition requirements provided in 10 U.S.C. § 2304(c) (2012).[5]

The issue, according to plaintiff, is whether this procurement violates CICA because it does not provide for competition at the initial phase but postpones true competition until the delivery order stage. Plaintiff points out that any contractor who submits a complying proposal for soft shelter systems is guaranteed that the agency will purchase at least $25,000 in products. Only when an actual order for tents is made will the contractors compete for the award of the delivery order. According to plaintiff, this procurement is fundamentally flawed because competition does not occur up front.

In response, defendant explains that "the term 'competition' is a term of art in CICA, and includes the well-established practice of issuing solicitations for multiple award contracts in which all fair and reasonable offers will be accepted." Def.'s Reply 3 (citing *Sys. Plus, Inc. v. United States*, 68 Fed. Cl. 206, 208-09 (2005)). DLA acknowledges that its approach is novel, but argues that it is supported by a range of statutory sources: 10 U.S.C. § 2304a(a) ("Subject to the requirements of this section . . . the head of an agency may enter into a task or delivery order contract . . . for procurement of services or property."), 41 U.S.C. § 3302(a)(3)(B) (2012) ("The term 'multiple award contract' means   . . . (B) a multiple award task order contract that is entered into under the authority of sections 2304a to 2304d of title 10, or chapter 41 of this title."), and 41 U.S.C. § 3302(a)(3)(C) ("The term 'multiple award contract' means   . . . (C) any other indefinite delivery, indefinite quantity contract that is entered into by the head of an executive agency with 2 or more sources pursuant to the same solicitation."). It also finds support for innovation in FAR 1.102, which provides:

> (d) The role of each member of the Acquisition Team [defined in FAR 1.102(c) as "all participants in Government acquisition"] is to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customer's needs. In exercising initiative, Government members of the Acquisition Team may assume if a specific

---

[5] 10 U.S.C. § 2304(a)(1) requires "full and open competition through the use of competitive procedures" except as provided in subsection (c). Without quoting those exceptions, we agree with plaintiff that none are applicable in this case.

strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

We agree with defendant that there is no direct prohibition on its approach. And the procurement is in literal compliance with regulations applicable to multiple award IDIQ contracts. Other than generally alleging that this procurement lacks competition, plaintiff has not identified the specific manner in which this procurement violated CICA. In the absence of a violation of law, FAR 1.102(d) provides the agency with a degree of flexibility in crafting its procurement. *See Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1333 (Fed. Cir. 2009). We conclude that DLA's efforts to create an online catalog of tents, which would be purchased later through delivery orders, was a permissible exercise of discretion and did not violate the law. *See id.* at 1334 (holding that, in the absence of law to the contrary, federal agencies have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation").

We reject the contention that there was no competition at the contract award stage. The administrative record makes clear that the agency took seriously the screening of quotations both for price and for whether the vendor at least purported to meet the minimum substantive requirements. It might have been easy to receive the initial contract award if a vendor offered a line of compliant tents, but receiving a contract was not guaranteed. The guarantee would only apply after award.

B.  Competition at the Delivery Order Level

In a second challenge to the promotion of competition within this solicitation, plaintiff contends that "one of the unintended consequences of this defective solicitation," particularly its use of the TBVD standard, "is that each order effectively becomes sole source." Pl.'s Mot. J. on the AR 18. Plaintiff reasons that when the customer picks the tent it desires from those available in the Emall then the provider of that tent will be awarded the delivery order without competition.

We disagree. Rather than leading to sole source contracts, this procurement vehicle permits contractors (once selected to participate in the

umbrella stage) to offer any shelter systems that the contractor believes is "equal" to the request identified in the delivery order. The market research memorandum explains that a "solicited item will contain salient characteristics for which an alternate may be submitted by a competing contract holder." AR 454. Thus, competition is encouraged rather than discouraged at the delivery stage. Moreover, vendors may update their catalogs of available shelter systems continuously, further promoting competition. The identification of a preferred type of tent by the customer is not the end, as plaintiff contends, but the beginning of another round of competition. This process therefore does not represent an improper sole source procurement in violation of CICA.

    C.    Specifying the Need Pursuant to 10 U.S.C. § 2305(a)(1)(A)(i), FAR 10.002(a), and FAR 12.202(b)

Plaintiff asserts that there is another fundamental flaw in this procurement, which is that the agency failed, before issuing the solicitation, to specify its needs "in a manner designed to achieve full and open competition" as required by 10 U.S.C. § 2305(a)(1)(A)(i) (2012), which is part of CICA, and FAR 10.002(a) ("Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research."). Plaintiff argues that there is no way of knowing, under the terms of the solicitation, whether DLA wants Boy Scout pup-tents or a shelter system designed to withstand desert conditions. This lack of precision, plaintiff argues, makes it virtually impossible to evaluate and compare proposals and also makes the Rule of Two analysis meaningless.

Plaintiff points to FAR 12.202(b), which sets out the following limitation:

> The description of agency need must contain sufficient detail for potential offerors of commercial items to know which commercial products or services may be suitable. Generally, for acquisitions in excess of the simplified acquisition threshold, an agency's statement of need for a commercial item will describe the type of product or service to be acquired and explain how the agency intends to use the product or service in terms of function to be performed, performance requirement or essential physical characteristics. Describing the agency's needs in these terms allows offerors to propose methods that will best meet the needs of the Government.

FAR 12.202(b).  Plaintiff explains that the solicitation contains very few specific requirements for the shelter systems, which is made even more vague and ambiguous by the prolific use of "TBVD" with respect to more detailed performance requirements such as the safety criteria, the level of reflectivity, durability, and the shelter's ability to withstand sunlight, vibration, heavy wind, steady rain, condensation, or extreme temperatures.

Defendant responds that the agency's acquisition plan was more than sufficient.  It identified the need as "versatile and fully supported Commercial Shelter Systems . . . [through] one or more Indefinite Delivery/Quantity type contracts for fully supported Commercial Shelter Systems in order to provide our customers with shelter options outside of the traditionally available military specification type tents."  AR 415.  Defendant argues that the level of specificity provided in the solicitation was sufficient to identify DLA's basic need, tents, and that anything more limited would defeat the intent to create a de facto catalog including many varieties of shelter systems.  Defendant points to the following passages of description from the solicitation: "tent and textile commercial soft shelter systems and associated support components that provide environmental protection," including "complete commercial soft shelter systems and their respective support components for General Purpose Tentage, Utility Shelters, Maintenance Shelters, Command Post Shelters, Vehicle Crew Tents, Lightweight Nylon Tents Assembly Tents, Medical Tents or Arctic Region Tents, Hybrid Soft/Hard wall Shelters."  AR 289.  The solicitation further defined commercial soft shelter systems as being

> modular in design allowing accessory upgrades or connectable to another shelter to allow for expansion.  The shelter must be a frame, air beam supported or hard wall box with extendible fabric extensions and constructed from a lightweight, water-resistant, mildew resistant and flame resistant fabric.  It is desired, but not required, that the Commercial Shelter System be supported by a mobile trailer system which is capable of providing electricity and maintaining a controlled environment in all climates and terrains except arctic.

*Id*.

Defendant also challenges plaintiff's "central thesis, that an agency must determine its 'actual needs' prior to issuing an IDIQ, [as] neither a CICA nor [a] FAR requirement."  Def.'s Mot. J. on the AR 19.  Defendant references the full text of 10 U.S.C. § 2305(a)(1)(A)(i), which provides, "In preparing for

the procurement of property or services, the agency shall (i) specify the agency's needs and solicit bids or proposals in a manner designed to achieve full and open competition for the procurement," *id.*, and points out that plaintiff's interpretation - that the agency must identify its "actual" and "legitimate" needs prior to issuing the solicitation - does not appear in the language of the statute. Defendant urges the agency's identification of its own needs is entitled to deference. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("competitors do not dictate an agency's minimum needs, the agency does").

The solicitation is ambiguous if its terms, taken in context of the whole solicitation, are susceptible to more than one reasonable interpretation. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Defendant points out that "[r]ather than identifying specific provisions that it contends are susceptible to more than one meaning, SEK generally complains that the performance requirements are not specific enough to provide 'meaningful guidance' for offerors." Def.'s Mot. J. on the AR 25. Here there is no ambiguity because, while the solicitation may provide that some of the specific tent qualities are TBVD, the offerors are still on notice that the agency is looking for information regarding those qualities (i.e. durability, rain, snow, mold, or fire resistance). The solicitation does not run afoul of FAR 12.202(b) because, as defendant correctly points out, it "identifies what is being acquired, AR 289, provides instructions for bid submissions, AR 340-41, and the criteria for award selection, AR 340," Def.'s Mot. J. on the AR 22, such that the offerors are able to compete intelligently and on an relatively equal basis. The description provided in the solicitation was adequate for the [ ] companies that submitted proposals despite plaintiff's complaints that the alleged ambiguity would "hamstringing" competition.

Lastly, defendant asserts, and we agree, that plaintiff's arguments about particular and itemized needs are at odds with the very nature of an IDIQ contract, which is used to accommodate uncertainty regarding the agency's need. *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 714 (2010) ("After all, uncertainty about the government's eventual needs is precisely what drives a procuring agency's decision to select the IDIQ contract vehicle.").

While plaintiff would like the court to construe the language of 10 U.S.C. § 2305(a)(1)(A)(i) and FAR 12.202(b) so as to require the agency to provide a detailed description of the items it seeks to obtain, we agree with defendant that such a requirement would be at odds with the very nature of an

13

IDIQ contract, and we do not read such rigidity in statute or regulation. Between 10 U.S.C. § 2305(a)(1)(A)(i), FAR 12.202(b), and FAR 10.002(a) there is a general requirement for the procuring agency to identify its needs in a manner that enables competition.  DLA did so here.  We agree with defendant that the solicitation sufficiently describes DLA's need for commercial soft shelter systems.  In fact, DLA's need for tents was understood by [    ] businesses that submitted proposals. The plain language of FAR 10.002(a) does not support plaintiff's position, and plaintiff does not cite any case law in support of its argument.  We conclude that the agency satisfied the requirements of 10 U.S.C. § 2305(a)(1)(A)(i), FAR 10.002(a), and FAR 12.202(b) by sufficiently identifying its needs.

   D. The "Bona Fide Needs" Requirement

Plaintiff asserts that this procurement also violates the related "bona fide needs" rule, which has its origin in 31 U.S.C. § 1341(a)(1) (2012) ("An officer or employee of the United States Government . . . may not   (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation.").  The requirement means "that appropriations for a particular year are to be obligated by an agency only to meet legitimate needs arising in the year of appropriation." *Lee v. United States*, 124 F.3d 1291, 1295 (Fed. Cir. 1997) ("The rule is intended to prevent agencies which do not have funds on hand for a particular purpose from committing the Government to make payments at some future time and thereby, in effect, coercing the Congress into making an appropriation to cover the commitment." (internal citation and quotation omitted)).  Plaintiff reasons that this rule is violated because this procurement does not identify DLA's actual need but nevertheless obligates a minimum of $25,000 in funds to each successful offeror.

Defendant responds that the "bona fide needs" rule does not apply when a contract is not funded through an annual appropriation. Defendant points out that DLA is funded through the Defense Capital Working Fund, *see* 10 U.S.C. § 2208,  which is not an annual appropriation and therefore not subject to the "bona fide needs" limitation.  We agree.  There has been no violation of the "bona fide needs" rule because DLA has not committed to pay for something requiring a future act of Congress.

E.    Criteria for Evaluation

Plaintiff asserts that the solicitation fails to comply with 10 U.S.C. § 2305(a)(2), because there are no meaningful evaluation criteria. The code section requires the following:

> (2) In addition to the specifications described in paragraph (1), a solicitation for sealed bids or competitive proposals (other than for a procurement for commercial items using special simplified procedures or a purchase for an amount not greater than the simplified acquisition threshold) shall at a minimum include--
>     (A) a statement of--
>         (i) all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating sealed bids (including price) or competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors); and
>         (ii) the relative importance assigned to each of those factors and subfactors.

According to plaintiff, the solicitation does not identify any evaluation factors, but postpones evaluation to the delivery stage.

The solicitation sets out the following evaluation criteria: "all firms offering Commercial Soft Shelters Systems that meet all of the terms and conditions of the solicitation, whose product line meets the statement of work and whose prices can be determined fair and reasonable." AR at 340. The evaluation factors, while more generic than one might anticipate at the ordering stage, are not entirely absent. The shelters have to be modular in design, allowing accessory upgrades or connectable to another shelter to allow for expansion; they must be either "a frame," air beam supported, or hard wall box with extendible fabric extensions; and they must be constructed from a lightweight, water-resistant, mildew-resistant and flame-resistant fabric. Additionally, the soft shelter system must come with instructions for assembly and disassembly, conform to safety and health hazard standards, and be repairable in the field. The solicitation further states that the price will be determined to be fair and reasonable in accordance with FAR Subpart 15.4.

Plaintiff's argument here is a variant of its challenge to the use of a two-stage procurement process, in which, at stage one, the agency merely sets out a general desire to buy tents with certain generic features, and only later identifies its particular needs. Defendant argues, and we agree, however, that it is sufficient to put bidders on notice for the agency to narrow the scope of possible purchases to tents and then merely require that the tents meet a minimum level of generic evaluation criteria. Particularly given the prior history of the agency's procurement of tents, and the level of interest shown by suppliers, we conclude that the agency satisfied its obligations under 10 U.S.C. § 2305.

II. Whether the Contracting Officer's Decision Not to Set this Procurement Aside for Small Businesses was Arbitrary or Capricious

Plaintiff argues that the CO failed to conduct the necessary Rule of Two analysis. The Rule of Two provides that the CO shall set aside acquisitions over $150,000 when he or she has a reasonable expectation that "offers will be obtained from at least two responsible small business concerns" and at "fair market prices." FAR 19.502-2(b). Plaintiff contends that "DLA's failure to determine the government's actual needs, and identify those items in the Solicitation, makes it impossible for the Agency to conduct the mandated 'Rule of Two' analysis because the Agency cannot determine whether small businesses offer products that will satisfy the government's needs." Pl.'s Mot. J. on the AR 21. Plaintiff's argument about the Rule of Two is linked to its first argument; namely, that the agency must specify its actual and legitimate needs before it issues a solicitation or conducts market research.

Plaintiff's argument is not really that the CO completely failed to conduct a Rule of Two analysis, which would be contrary to the evidence in the record, but that the CO's analysis was fundamentally flawed because she was not asking the right questions. The CO analyzed whether there were two or more small businesses capable of providing DLA with the range of tents client customers might need and concluded that "both large and small business are crucial to satisfy the requirements and there are not two or more small businesses within this market capable of providing the full array of Shelters and associated components desired by the customers." AR 454. According to plaintiff, if the solicitation had actually identified needs on a more particularized basis, and if the CO then had asked whether two small businesses could meet that specific need, then there might have been two or more small businesses available to meet that need at fair market prices.

16

Plaintiff's real disagreement is thus once again with the structure of the solicitation, which we have already determined was in accordance with law. Requiring the agency to determine particularized needs at the umbrella contract level would be tantamount to using a totally different approach to the procurement. Assuming that the use of the umbrella concept was proper, then the question merely becomes whether what the CO did was reasonable. We do not sit in the place of the CO and conduct the Rule of Two analysis *de novo*.

In deciding whether the requirement of FAR 19.502-2(b) is triggered, the CO may consider "prior procurement history, the nature of the contract, market surveys, and/or advice of the agency's small business specialist." *MCS Mgmt., Inc. v. United States*, 48 Fed. Cl. 506, 511 (2000). In this case, defendant argues that the CO undertook reasonable efforts to determine if the Rule of Two was satisfied because she called eleven companies to gauge their interest, compared the most popular tents under the TLSP to those offered by small businesses that had submitted proposals, and sought equivalent products amongst small businesses. While the CO found that small businesses offered some of the products that would likely be obtained through the Emall, the CO reasonably concluded that soft shelter systems provided by both large and small businesses were necessary to achieve the full range of products required by the government. This is reflected in the fact that under the previous procurement, the TLSP, the small business manufacturer rule had to be suspended so that small businesses could offer products manufactured by large businesses. It was logical, moreover, to test the agency's initial hypothesis (that the umbrella contract could not be limited to small businesses) by isolating a few items from past procurements that were in high demand. If those were not offered by small businesses, there was no point undertaking the exercise more extensively.

We agree with defendant that the CO employed reasonable efforts in her analysis and came to a reasonable conclusion, which we are not in a position to second guess. We note that even the SBA consented to the CO's decision not to set this solicitation aside. AR 455. Finally, DLA committed to setting aside delivery orders that could be filled by small businesses pursuant to FAR 16.505(b)(2)(i)(F). We conclude that the "contracting agency

provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333 (citation and quotation omitted).[6]

III.   Injunctive Relief

Because we reject plaintiff's substantive challenges to the procurement, it is unnecessary to evaluate whether it has met the tests for awarding injunctive relief.

## CONCLUSION

For reasons explained above, we deny plaintiff's motion for judgment on the administrative record and grant defendant's cross-motion. The Clerk is directed to enter judgment accordingly. No costs.


s/ Eric G. Bruggink  
ERIC G. BRUGGINK  
Judge

---

[6] At oral argument, for the first time plaintiff raised the argument that, even if the CO reasonably determined that the full spectrum of tents could not be supplied by small businesses, the CO was still required to decide whether part of the full spectrum qualified for a partial set-aside pursuant to FAR 19.502-3 (Partial set-asides). Because this argument was not timely raised, we need not address it. We feel confident, however, that the agency's commitment to set aside delivery orders for competition amongst small businesses achieves the same result sought by FAR 19.502-3.